**[Cite as *In re K.S.*, 2026-Ohio-1134.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: D.H.
    K.S.
    M.H.

C.A. Nos.    31424
                  31425
                  31426
                  31634
                  31635

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 23 07 0605
                DN 23 07 0606
                DN 23 07 0607

## DECISION AND JOURNAL ENTRY

Dated: March 31, 2026

CARR, Presiding Judge.

{¶1}    Appellants Mother and Father appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that awarded legal custody of their children to a maternal great aunt and uncle ("Aunt" and "Uncle"). This Court affirms.

I.

{¶2}    Mother is the biological mother of K.S., born September 15, 2019; M.H., born August 10, 2021; and D.H., born January 1, 2023. Father is the biological father of M.H. and D.H. The paternity of K.S. has not been established.

{¶3}    Mother and Father have multiple criminal convictions for various offenses, and both are registered sexual offenders. Their sexually oriented crimes arose out of the same incident

involving Mother's minor stepsister. In addition, both parents have a child welfare history involving their children. Summit County Children's Services Board ("CSB" or "the agency") intervened in both 2019 and 2020 regarding K.S. based on Mother's incarceration, cognitive delays, parenting issues, and use of methamphetamine. The agency became involved again in 2021 regarding K.S. and M.H. based on concerns that Mother and Father were using methamphetamine and engaged in a domestically violent relationship, that their infant was not gaining weight appropriately, and that Father was having contact with both children in violation of his rules of parole. The specifics of CSB's involvement with the family are unknown. Mother retained legal custody of K.S. and M.H., and D.H. was born thereafter.

{¶4} In 2023, CSB discovered ongoing concerns in the children's home. Father was incarcerated. Mother's home was filthy and unsafe. She tested positive for methamphetamine use, applied inappropriate discipline and exhibited a lack of parenting skills with the children, and exposed the children to dangerous individuals. K.S., who was almost four years old at the time, was unable to speak in complete sentences and exhibited other developmental delays. CSB removed the children from Mother's home and filed complaints alleging dependency, neglect, and abuse.

{¶5} After an adjudicatory hearing, the juvenile court found the children to be neglected and dependent. Thereafter, the trial court awarded temporary custody to CSB, which placed the siblings in the home of Aunt and Uncle. The juvenile court adopted the agency's case plan as an order. Father was directed to notify the caseworker if he was interested in visitation or placement of the children; and to abide by all conditions of his parole, including mental health and anger management treatment, sexual offender programming, and substance use screenings. Mother's case plan objectives derived from her parenting assessment recommendations and included dual

diagnosis mental health and drug abuse treatment, intimate partner violence education in a therapeutic setting, a psychiatric evaluation, attaining and maintaining sobriety from all intoxicating substances, random drug and alcohol screens, successful completion of the Nurturing Parent program through The Bair Foundation ("Bair") and following all recommendations arising therefrom, and demonstrating the ability to provide for the children's basic needs.

{¶6} At the first review hearing, the evidence demonstrated that Mother continued to test positive for methamphetamine use and was struggling at visits to apply appropriate parenting techniques. Father had had no visits with the children because he had not yet completed six months of sexual offender programming as required by the terms of his parole. By the second review hearing, Mother had begun making some progress in treatment and she had a job. She had let Father move in with her, however. Both the caseworker and guardian ad litem were concerned because, as Father was precluded from having any contact with the children while on parole, his residence in Mother's home posed a barrier to reunification of the children with Mother.

{¶7} In advance of the one-year sunset date, CSB moved for legal custody to Aunt and Uncle. Mother and Father each moved alternatively for legal custody or a first six-month extension of temporary custody. After hearing the parties' motions 14 months into the case, the magistrate issued a decision granting legal custody of the three children to Aunt and Uncle. Both parents filed objections.

{¶8} The juvenile court overruled Mother's and Father's objections, denied their motions for a first six-month extension of temporary custody, placed the children in the legal custody of Aunt and Uncle, and left visitation in the discretion of the legal custodians. Mother and Father appealed, each raising two interrelated assignments of error. As the parents consolidated

their respective assignments of error, and all four implicate overlapping issues, this Court consolidates them to facilitate our review.

II.

### MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION TO GRANT LEGAL CUSTODY TO [AUNT AND UNCLE] WAS AGAINST THE MANIFEST WEIGHT OF EVIDENCE AND NOT IN THE BEST INTEREST OF THE CHILDREN.

### MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN DENYING MOTHER'S MOTION FOR A SIX-MONTH EXTENSION AS SHE PROVED BY CLEAR AND CONVINCING EVIDENCE THAT THE GRANTING OF THE EXTENSION WAS IN THE BEST INTEREST OF THE CHILDREN, THAT MOTHER HAD MADE SIGNIFICANT/SUBSTANTIAL PROGRESS ON HER CASE PLAN OBJECTIVES DURING THE FIRST YEAR AND THERE WAS A STRONG LIKELIHOOD THAT THE CHILDREN WOULD BE PLACED IN MOTHER'S LEGAL CUSTODY DURING THE SIX-MONTH EXTENSION.

### FATHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN DENYING THE PARENTS' MOTION FOR SIX-MONTH EXTENSION OF TEMPORARY CUSTODY AND FINDING THAT IT WAS IN THE CHILD[REN]'S BEST INTEREST TO BE PLACED IN THE LEGAL CUSTODY OF RELATIVES.

### FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND PLAIN ERROR IN GRANTING LEGAL CUSTODY OF THE CHILDREN TO RELATIVES AS THE COURT'S DECISION WAS NOT SUPPORTED BY [A] PREPONDERANCE OF THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶9}   Mother and Father argue in their respective consolidated assignments of error that the juvenile court erred by awarding legal custody of the children to Aunt and Uncle. This Court disagrees.

{¶10}   Our standard of review for such challenges is well settled:

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

{¶11} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶12} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.). In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.).

{¶13} The best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see*

*also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶14} In considering the evidence adduced at the hearing, this Court notes that the matter proceeded before the magistrate over the course of three days. Unfortunately, the recording equipment failed on the second day of the hearing, when the agency caseworker testified. The parties submitted affidavits of the evidence from that day. No party objected to the affidavits submitted by any other parties. The juvenile court considered the affidavits along with the transcripts of the first and third days of the hearing. This Court does likewise.

{¶15} The children were in Mother's legal custody until CSB removed them. The oldest, K.S., was not yet four years old, while M.H. was still under two. D.H. was six months old. The children spent the next 20 months, a large portion of their lives, in the care of Aunt and Uncle.

{¶16} Mother takes advantage of her opportunity to visit with the children four hours a day, two to three times a week. The children share a strong bond with Mother. They are also closely bonded with Aunt, Uncle, and a young adult cousin who lives in that home with them. The children have only seen Father twice since their removal: once during the sole visit authorized by Father's parole officer, and once when Mother allowed Father to join her without permission for a visit in a park. There was no evidence of a bond between the children and Father. The children interact as typical siblings, occasionally fighting amongst themselves.

{¶17} K.S. has some developmental delays, particularly related to speech issues. While living with Mother, and at almost four years old, the child was not speaking in full sentences. She has an individualized education program ("IEP") and recently began a second year in preschool in lieu of starting kindergarten. Mother admitted that she had never contacted K.S.' teachers to discuss the child's IEP, delays, or progress.

{¶18} The caseworker and guardian ad litem testified that the children are thriving in the care of Aunt and Uncle. The relatives meet the children's basic and special needs. They have a solid and supportive relationship with Mother, encouraging her relationship with the children and facilitating visitation. Aunt and Uncle testified that they believe it is important for the children to spend time with Mother and they will continue to provide opportunities for liberal visitation. Both testified that they will abide by any court order regarding visitation for both parents.

{¶19} After spending a significant portion of their lives in CSB's temporary custody, the children need a legally secure permanent placement. Father was in prison at the time of the hearing and was precluded by the rules of his parole from having contact with the children until approved by his parole officer. His sexual offender programming was slated to last two to four years, during which time Father's opportunity for access to the children would be restricted. The evidence demonstrated that Father was not a viable candidate for custody for the foreseeable future.

{¶20} CSB removed the children from Mother's care based on multiple issues impacting her ability to provide a safe and stable environment for them. Mother's parenting assessment identified deficiencies that the agency's case plan was designed to address. Specifically, Mother struggles with mental health, substance abuse, intimate partner violence, parenting, and basic needs issues. She also has significant cognitive delays. Accordingly, CSB linked Mother to

service providers who were competent to assist her in addressing her case plan objectives in consideration of her delays.

{¶21} Mother participated in services, and the guardian ad litem testified that he gave her "one hundred percent for effort." Nevertheless, Mother made minimal progress and continued to struggle in overcoming the problems underlying the children's removal from her home. For example, despite consistently attending mental health and substance abuse programming at Community Health Center, Mother denied her established issues in both areas, demonstrated poor insight and judgment, and tested positive for intoxicating substances intermittently throughout the cases. Although Mother took her prescribed medications for "[a]nger and anxiety and drama[,]" she testified that her only mental health diagnosis was grand mal seizures. She believed that she was managing her anger effectively because she had not killed her father despite the reasons he had given her to do so.

{¶22} The caseworker and guardian ad litem testified that Mother demonstrated an ongoing lack in judgment by allowing Father to live with her during the cases despite the order prohibiting his contact with the children and prior incidents of intimate partner violence between the parents. Mother testified that she let Father live with her because her home was close to his job and the location where he obtained his medications. Mother demonstrated no understanding that Father's presence in her home was a barrier to her reunification with the children. Father left Mother's home only because he was imprisoned after violating the terms of his parole by having unauthorized contact with the children. Mother testified that she would not let Father return to her home after his release from prison, reasoning that she planned to move and her new home would not be close to Father's job or medication provider.

{¶23} Throughout the cases, Mother reported to her service providers that she did not have any substance abuse issues. Although she tested positive for methamphetamine and marijuana use at various times, she always denied the validity of those results. She failed to submit to four requested drug screens during the month prior to the hearing. Mother was unable to demonstrate sustained sobriety for longer than four months. Although she admitted she understood that the recommendation for "full abstinence" meant refraining from use of legal intoxicating substances like alcohol and marijuana, she continued to use those substances. This caused great concern for the caseworker and guardian ad litem who testified that alcohol and marijuana impairment exacerbated Mother's parenting skills deficits caused by her cognitive delays.

{¶24} Mother's case plan required her to address her past trauma associated with intimate partner violence. Although she consistently attended counseling appointments, she refused to address her history of relationships with perpetrators of violence. Mother alluded to an ongoing strained relationship with her father due to his behavior. Moreover, there were incidents of violence in her relationship with Father, a man she continued to house until he was remanded to prison. Mother admitted that her cyclical history of domestic violence "looks bad." She testified that she would avoid further incidents by "stay[ing] single" if she regained custody of the children because she now recognizes the "red flags" of domestic violence. She identified those as "[b]eing choked in front of your kid[,]" and "[h]aving your dad at your house with a pocketknife waving it around the house." Mother did not explain what signs or behaviors might indicate that a relationship could become violent before violence actually occurred.

{¶25} CSB facilitated parenting education for Mother. Although she received a certificate after completing a 12-week parenting program at Greenleaf, Mother struggled to apply effective parenting techniques with the children. The caseworker referred Mother to an intensive, hands-

on, one-on-one parenting program at Bair. Ideally, Mother would have made progress addressing her mental health and substance abuse issues before focusing on parenting deficits to give her a greater opportunity for success. After Mother failed to make the desired progress regarding mental health and substance abuse in a timely manner, however, the caseworker made the referral to Bair while there was still time for Mother to engage and receive a benefit from those services. The Bair program was designed for completion in 12 weeks. After four months, however, Mother had completed only half the program. She struggled with comprehension and retention of information despite the service provider's modeling appropriate behaviors, repetition, redirection, and reinforcement. While the Bair specialist testified that Mother was making some progress, she admitted that Mother was not able to consistently apply techniques learned during one visit to subsequent visits.

{¶26} Finally, Mother was required to demonstrate that she was able to meet the children's basic and special needs. Mother admitted that she did not know the specifics of K.S.' delays and IEP. She could not articulate when it would be necessary to seek medical attention for a child, stating only that a child should go to the hospital if the child's temperature was "about 81" because that was a high temperature that could lead to a seizure.

{¶27} Although she had been working at Taco Bell, Mother lost that job after someone complained about her sexual offender status. Mother receives $900 per month in social security disability income, which just covers her rent and utilities. Mother does not qualify for subsidized housing due to her sexual offender status. She alluded to having found a new home she would keep secret from Father, but she did not explain when she planned to move. The caseworker and guardian ad litem had no information about Mother's potential new housing and could not testify as to the propriety of that home.

{¶28} The guardian ad litem opined that it would be in the children's best interest to place them in the legal custody of Aunt and Uncle. He testified that Mother had much more to learn before she could effectively parent and that he did not believe that Mother would attain those skills within another six months. His biggest concerns centered on Mother's lack of insight into her mental health and substance abuse issues; her poor judgment evidenced by her relationships with violent partners and sexual offenders, including Father and another man living with Mother when CSB removed the children; and her failure to take accountability for the issues underlying the agency's involvement. Mother's lack of understanding as to the reasons for CSB's intervention was evidenced by her testimony that the agency removed the children because her home was cluttered and she owned a big dog the caseworker believed was aggressive.

{¶29} Based on a thorough review of the record, this is not the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody to Aunt and Uncle. Despite engaging in services, Mother has been unable to learn and apply parenting skills necessary to provide a safe, stable, and appropriate environment for the children. She has made minimal progress addressing mental health and substance abuse issues. She has not addressed the role of intimate partner violence in her life and the potential harm those circumstances pose for the children. She cohabited with Father even though his presence in her home posed a barrier to her reunification with the children. Although Mother testified that she would not let Father return to her home after his release from prison, she never demonstrated throughout the cases that she could sever their relationship.

{¶30} On the other hand, the children are well acclimated to the home they share with Aunt and Uncle. They enjoy a strong bond with Aunt and Uncle who are willing and able to provide for the children's needs in a safe, stable, and permanent environment. Aunt and Uncle

have a good relationship with Mother. They support and nurture her relationship with the children. They understand the parents' residual rights and responsibilities and agree to honor all court orders relating to visitation. The guardian ad litem supports an award of legal custody to Aunt and Uncle as being in the children's best interest. Under these circumstances, the juvenile court's judgment is not against the manifest weight of the evidence.

{¶31} Mother and Father also argue that the juvenile court erred by failing to grant their motions for a six-month extension of temporary custody. This Court disagrees.

{¶32} The juvenile court has authority to grant a first six-month extension of temporary custody only if it finds, by clear and convincing evidence, that the extension is in the best interest of the child, that "there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents . . . within the period of extension." R.C. 2151.415(D)(1). All three statutory requirements must be met to substantiate an extension of temporary custody, thereby delaying timely custodial permanence. *See In re A.P.*, 2022-Ohio-276, ¶ 9 (9th Dist.).

{¶33} The evidence cited above demonstrates that legal custody to Aunt and Uncle meets the best interest of the children. Neither parent presented clear and convincing evidence to contradict that finding. Aunt and Uncle are appropriate current and future caregivers for the children, while neither parent demonstrated that an extension of temporary custody would be in the siblings' best interest.

{¶34} As to case plan compliance, Father does not argue that he made progress on his objectives. Rather, he focuses on Mother's compliance. As explained above, however, Mother failed to make significant progress on her case plan objectives. Despite participation in services, Mother had minimal success addressing her mental health, substance abuse, and parenting issues.

She failed to acknowledge her history of intimate partner violence during treatment. She lacked understanding regarding K.S.' special needs and struggled to demonstrate the ability to provide for the children's ongoing basic needs. Under these circumstances, Mother and Father failed to meet their respective burdens of proving significant case plan compliance.

{¶35} Finally, there was no reasonable cause to believe that the children would have been reunified with Mother or Father within the period of extension. Father was incarcerated and made no progress toward reunification. Mother engaged consistently in various services but lacked insight into the issues underlying the children's removal; failed to demonstrate an improvement in judgment, particularly relating to her association with people who posed a risk to the children's well-being; and struggled to learn and apply basic parenting techniques. The specialist from Bair testified that Mother could not demonstrate skills learned one week in later visits with the children. The guardian ad litem recognized Mother's efforts but opined that she would not successfully assimilate the parenting skills necessary to provide an appropriate home for the children during the next six months. Accordingly, the parents failed to present clear and convincing evidence that reunification was reasonably likely to occur within the period of an extension of temporary custody.

{¶36} For the above reasons, this Court concludes that the juvenile court did not err by denying the parents' motions for a six-month extension of temporary custody and granting CSB's motion for legal custody to Aunt and Uncle. Accordingly, Mother's and Father's respective first and second assignments of error are overruled.

III.

{¶37} Mother's and Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

_____
DONNA J. CARR
FOR THE COURT

FLAGG LANZINGER, J.
SUTTON, J.
CONCUR.

APPEARANCES:

RONALD T. GATTS, Attorney at Law, for Appellant.

SHUBHRA N. AGARWAL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.